# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-734 (JEB)** |
| **v.** | : | |
| | : | |
| **LAWRENCE DROPKIN, JR.,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Lawrence Dropkin, Jr. ("Dropkin") to 30 days' incarceration on Counts One and Two, 3 years of probation on Counts Three and Four, 60 hours of community service, and $500 in restitution.

### I.       Introduction

Defendant Lawrence Dropkin, Jr., a 46-year-old salesman and delivery driver from New Jersey, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress' certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.[1]

---

[1] According to the presentence report ("PSR"), as of April 5, 2022, the incident resulted in substantial damage to the U.S. Capitol, requiring the expenditure of approximately $2,734,783.14. PSR ¶ 17.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Dropkin pleaded guilty, without a plea agreement, to a four-count information charging him with: (1) Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); (2) Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); (3) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (4) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 30 days' incarceration on Counts One and Two, and 36 months' probation on Counts Three and Four is appropriate in this case because Dropkin: (1) entered the Capitol Building just four minutes after the initial violent breach of the Senate Wing Doors; (2) was part of a large mob of rioters that overwhelmed police officers; (3) remained and paraded throughout several sections of the Capitol Building for an hour; (4) used his cell phone to record video of the riot, including altercations with police officers; and (5) was motivated to participate in the riot in order to stop what he believed was a "stolen election."

The Court must also consider that Dropkin's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). Dropkin's actions and those of his fellow rioters enabled the breach the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States*

*v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the facts of and circumstances of Dropkin's crime support a sentence of 30 days' incarceration and 36 months' probation in this case.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol contained in the affidavit that was filed with the complaint in this case. *See* ECF 1 (Statement of Facts), at 1. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Dropkin's conduct and behavior on January 6.

### Defendant Dropkin's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Dropkin was in Washington, D.C. after travelling from his home in New Jersey. Dropkin admittedly was not there merely to protest the 2020 presidential election results. When interviewed by the Probation Officer, he stated that he "wanted to help President Trump stop what he said (and I believed) was a stolen election." PSR ¶ 19.

Recordings from the U.S. Capitol's closed-circuit video ("CCV") system show that at approximately 2:13 p.m., rioters had breached the Senate Wing Doors by smashing and entering through the windows and then kicking the doors open from the inside to allow more rioters to enter. As shown in Image 1, below, just four minutes after that initial breach, at approximately 2:17 p.m., Dropkin walked through the Senate Wing Doors and entered the Capitol Building.



Image 1: *Dropkin entering the Capitol Building through the Senate Wing Doors at 2:17 p.m.*

At this time, Dropkin would have heard the alarms, seen the broken windows, the shattered glass on the floor, and the chaos inside the building. As shown on the CCV and in Image 2, below, once inside the Capitol Building, Dropkin raised his arm and appeared to shout in celebration.



Image2: *Dropkin celebrating inside the Capitol Building*

Between approximately 2:17 p.m. and 3:18 p.m., Dropkin paraded through several sections of the Capitol Building. PSR ¶ 16. Most notably, Dropkin was with a group of rioters that amassed outside the Crypt where a police line had formed to keep the rioters from moving forward. As shown in Images 3, 4, and 5 below, and in the video submitted herewith as Exhibit 1, at approximately 2:26 p.m., rioters pushed through the police line in the Crypt, allowing a mass of rioters, including Dropkin, to surge into the Small House Rotunda and the Hall of Columns.



Image 3: *Rioters pushing through police line in the Crypt at 2:26 p.m.*



Image 4: *Dropkin with other rioters surging into Small House Rotunda at 2:26 p.m.*



Image 5: *Dropkin using his cell phone to record the chaos in the Small House Rotunda*

After the surge into the Small House Rotunda, Dropkin walked through National Statutory Hall at approximately 2:33 p.m.  He then walked down another hallway at approximately 2:45 p.m., as shown in Image 6, below, and then back through National Statutory Hall at approximately 2:55 p.m., as shown in Image 7, below. PSR ¶ 16.



Image 6: *Dropkin using his phone to record inside the Capitol Building.*



Image 7: *Dropkin in National Statutory Hall.*

As shown in Images 8 and 9, respectively, Dropkin moved through the House corridors at approximately 2:47 p.m. and back into Statuary Hall at approximately 2:55 p.m.



Image 8: *Dropkin in the House corridors at approximately 2:47 p.m.*



Image 9: *Dropkin in Statuary Hall at approximately 2:55 p.m.*

At approximately 2:58 p.m., as shown in Image 10, he entered the Rotunda. While Dropkin loitered in the Rotunda, dozens of Metropolitan Police Department ("MPD") officers entered the Rotunda and tried to clear the rioters of that room, as shown in Image 11, below.



Image 10: *Dropkin entering the Rotunda at approximately 2:58 p.m.*



Image 11: *Dropkin in close proximity to altercations with MPD officers.*

At approximately 3:05 p.m., several rioters confronted the MPD officers in riot gear, and some physically assaulted the officers. As shown in Image 11, above, and Image 12, below, Dropkin was in close proximity to these altercations, observed these altercations, did not disperse after seeing these altercations, and appeared to use his phone to record these altercations.



Image 12: *Dropkin continues to record additional altercations with MPD officers.*

Dropkin remained inside the Rotunda for approximately 15 minutes, until additional MPD officers in riot gear entered and forced the rioters out. PSR ¶ 16.  Enclosed herewith as Exhibit 2 is the CCV recording of several clashes between rioters and MPD officers in the Rotunda.  As can be seen in the video, Dropkin remained in close proximity to these altercations until the officers successfully forced the rioters out of the Rotunda.

By approximately 3:16 p.m., Dropkin had been forced out of the Rotunda along with other rioters by the MPD officers. As shown in Image 13, below, Dropkin exited the Capitol Building through the Rotunda Doors at approximately 3:18 p.m.



Image 13: *Dropkin exiting the Capitol Building at approximately 3:18 p.m.*

After pleading guilty, Dropkin admitted the following to the U.S. Probation Officer with respect to his conduct at the Capitol Building on January 6, 2021: "[W]hile there, I did see others engage in physical altercations with uniformed officers and I did see property being damaged.  The

resulting situation was chaotic and unpredictable. Seeing those things, I did not then leave the Capitol Building and instead remained there and walked through various areas." PSR ¶ 19.

*The Charges and Guilty Plea*

Prior to his arrest, Dropkin, with the assistance of counsel, agreed to voluntarily surrender to the FBI before any formal charges were filed against him.  On October 1, 2021, Dropkin reported to the FBI in New Jersey, and he was formally arrested and charged for his conduct at the Capitol Building on January 6, 2021.  He declined to provide a statement to the FBI. The United States Attorney's Office for the District of Columbia charged Dropkin by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On December 14, 2021, Dropkin was charged by a four-count Information with the same violations as charged in the complaint. Dropkin rejected the Government's plea offer, but on July 12, 2022, he pleaded guilty to all four counts of the Information.

## III.   Statutory Penalties

As to Counts Three and Four, and as noted by the U.S. Probation Office, Dropkin faces up to six months of imprisonment and a fine of up to $5,000. As these offenses are Class B Misdemeanors, the Sentencing Guidelines do not apply. U.S.S.G. § 1B1.9. As to Counts One and Two, Dropkin faces up to one year imprisonment and a $100,000 fine. These are Class A Misdemeanors, 18 U.S.C. § 3559(a)(6), to which the Sentencing Guidelines **do** apply.

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful

study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

With one exception, the government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the applicable guideline for both Counts One and Two is U.S.S.G. § 2B2.3. PSR ¶ 24. Therefore, the U.S. Probation Office calculated Dropkin's adjusted offense level under the Sentencing Guidelines as follows:

> Group 1: Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1); and Disorderly and Disruptive Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2)

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. § 2B2.3(b)(1)(A)(vii)) | +2 |
| Adjusted Offense Level | 6 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)) | -2 |
| **Total Adjusted Offense Level** | **4** |

*See* PSR at ¶¶ 24-36.

The Government disagrees with the Probation Office that Section 2B2.3 applies to both Counts One and Two. Section 2A2.4, not Section 2B2.3, is the most appropriate guideline that applies to a conviction under 18 U.S.C. § 1752(a)(2). The Sentencing Guidelines provide that a defendant convicted of an 18 U.S.C. § 1752 offense is subject to either Section 2A2.4, which is titled "Obstructing or Impeding Officers," or Section 2B2.3, which is entitled "Trespass." *See* U.S.S.G., App. A. If more than one Guidelines provision may apply to a particular offense, the court should "use the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted." U.S.S.G. § 1B1.2 cmt. n.1. The "most appropriate" of the two potentially applicable guideline provisions is the one that best reflects the "offense conduct

charged" in the count of conviction, based on a consideration of the elements of the offense. U.S.S.G. § 1B1.2 cmt. n.1; *accord id.* § 1B1.2(a).

Under this standard, the most appropriate guidelines for a Section 1752(a)(2) offense is that found in Section 2A2.4. Section 1752(a)(2) criminalizes "engag[ing] in disorderly or disruptive conduct" that "in fact, impedes or disrupts the orderly conduct of Government business or official functions." 18 U.S.C. § 1752(a)(2). As noted above, Section 2A2.4 is entitled "Obstructing or Impeding Officers," a title that parallels Section 1752(a)(2)'s requirement that the defendant have "*in fact*" "impede[d] or disrupt[ed] . . . Government business or official functions" undertaken by government officials.

The contrast with Section 1752(a)(2)'s neighboring provision, Section 1752(a)(1), makes even clearer that Section 2A2.4, not 2B2.3, is the appropriate guidelines provision. Section 1752(a)(1) criminalizes merely "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority"—functionally, illegal trespass on Capitol grounds. The most appropriate guidelines provision for that offense is thus plainly Section 2B2.3, which covers "Trespass." But an offense like Section 1752(a)(2), which requires that the defendant both have engaged in disorderly or disruptive conduct *and* in fact have impeded government officials conducting official business, is not captured by a mere "Trespass" guideline. It does, however, correspond closely to an "Obstructing or Impeding Officers" guideline.

Moreover, even if one assumed that Section 2A2.4's "Obstruction" guidelines do not *perfectly* reflect the offense conduct of a Section 1752(a)(2) offense, that does not mean Section 2B2.3 applies. There is no default rule favoring the more lenient guidelines provision. Instead, the only question under the guidelines is which of the two guidelines provisions better captures—even if only slightly better—the offense conduct. And here, a guidelines provision for "Obstructing or

13

Impeding Officers" clearly is *closer* to reflecting the offense conduct (disorderly and disruptive conduct that impeded government officials) than a guidelines provision for "Trespass," which does not reflect disorderly or disruptive conduct at all or interference with government officials at all.

Finally, in three other PSRs in separate cases, the Probation Office has agreed with the United States that Section 2A2.4 is the appropriate guideline for Section 1752(a)(2) offenses. *See United States v. Rubenacker*, No. 21-CR-193-BAH, Dkt. 52 ("PSR") at ¶ 46; *United States v. Bromley*, No. 21-CR-250-PLF, Dkt. 48 ("PSR"), at ¶ 45; *United States v. Sidorski*, 21-CR-48-ABJ, Dkt. 42 (Sentencing Memo setting forth PSR calculations), at 19-20. In the *Bromley* case, Judge Friedman applied Section 2A2.4; in the *Sidorski* case, Judge Berman Jackson did the same, though she expressed some reservations at sentencing about whether it was well-suited to a Section 1752(a)(2) offense. In another case, the PSR has not yet issued, but the defendant's plea agreement stipulated to the applicability of Section 2A2.4, as in this case. *See United States v. Baggot*, No. 21-CR-411-APM, Dkt. 49 ("Plea Agreement"), at 3.

Here, Section 2A2.4 is the "most appropriate" applicable guideline provision that best reflects the "offense conduct charged" in Count Two. The Information charges that Dropkin knowingly engaged in disruptive conduct where that conduct "in fact" impeded and disrupted government business. Because a defendant cannot "in fact" impede government business without also impeding and obstructing officers—as Dropkin did here—the most appropriate guideline §2A2.4 (Obstructing or Impeding Officers), which has a Total Offense Level of 10. As addressed below, the Government acknowledges that this does not affect Dropkin's overall guidelines computation once Acceptance of Responsibility is factored in.

Applying Section 2A2.4, the Guidelines calculation for Count 2, the section 1752(a)(2) offense, is as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.4(a)) | 10 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1(a) | -2 |
| **Total Adjusted Offense Level** | **8** |

The U.S. Probation Office calculated Dropkin's criminal history as 0, which results in a criminal history category of I. PSR ¶ 43. Accordingly, whether Section 2A2.4 or 2B2.3 is used, Dropkin's Guidelines total adjusted offense level, after acceptance, is either 8 or 4, respectively. Thus, his corresponding Guidelines imprisonment range is 0 to 6 months irrespective of the two Guideline calculations. *See* U.S.S.G., Ch. 5, Pt. A (Sentencing Table); PSR ¶ 97.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various

> institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 60 days' incarceration on Counts One and Two, 3 years of probation on Counts Three and Four, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Dropkin's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the

defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Dropkin personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Dropkin is therefore not a mitigating factor in misdemeanor cases.

Dropkin entered the Capitol Building a mere four minutes after the initial breach at the Senate Wing Door. While no police officers blocked his path, there were clear signs of violent entry. The window adjacent to the door through which Dropkin passed had just been smashed out and Dropkin would have walked directly by a pile of shattered glass on the ground and heard alarms as he moved into the Capitol Building. Dropkin was then part of a large crowd that surged past a police line in the Crypt causing officers to fall back from their positions. While there is no evidence that he pushed any officers, his presence alone in the mob created an overwhelming and unmanageable situation for those officers. Perhaps most troubling though was Dropkin's conduct in the Rotunda. There, after MPD officers in riot gear entered to contain the mob, Dropkin stayed in the Rotunda, positioned himself close to those officers, and rather than exit the building, he instead recorded several altercations with his cell phone. Dropkin was inside the Capitol Building for approximately one hour.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 30 days' incarceration on Counts One and Two, and 3 years' probation on Counts Three and Four.

### B.  The History and Characteristics of Dropkin

While Dropkin does not have any criminal history points, the PSR shows that this matter is far from his first encounter with the criminal justice system. In November 2013, Dropkin pled

guilty to a charge of solicitating without a permit and paid a fine. PSR ¶ 42. Years prior, he pled

guilty to two public urination charges in 2005 (PSR ¶ 41) and 2002 (PSR ¶ 39), and paid fines for

both. Lastly, in 2002, he pled guilty to a disorderly conduct/fighting charge and paid a fine. PSR

¶ 40.

Although Dropkin declined to sign a plea agreement or submit to an interview with the

government, Dropkin promptly accepted responsibility for his actions. Based on his interview with

the U.S. Probation Office, he appears sincerely remorseful for his actions on January 6, 2022.  The

assigned Probation Officer also noted that Dropkin's "expressions of remorse and his positive

pretrial compliance" suggest that Dropkin is "amenable to positive change." PSR ¶ 128.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The

violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and

appalling disregard for our institutions of government and the orderly administration of the

democratic process."[2] As with the nature and circumstances of the offense, this factor supports a

sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the

January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21

at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of

probation. I think the presumption should be that these offenses were an attack on our democracy

and that jail time is usually -- should be expected") (statement of Judge Hogan).

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [[Defendant Last Name]] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

20

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Dropkin's conduct on January 6, entering the Capitol Building through the Senate Wing Door past obvious signs of violence and destruction, entering the Small House Rotunda and the Rotunda, which had been overrun with rioters, and walking through the building despite these signs of lawlessness clearly demonstrates the need for specific deterrence for this defendant. Despite the presence of law enforcement, he stayed in the Capitol for approximately an hour, and took his conduct to a level beyond simple parading by moving towards rioters engaged in altercations with officers in order to film the altercations.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Dropkin based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot. Although those like Dropkin convicted of misdemeanors are generally less culpable than

---

[3] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[4] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Dropkin has pleaded guilty to all four counts of the Information, charging him with violating 18 U.S.C. §§ 1752(a)(1) and (2), which are Class A misdemeanors, and 40 U.S.C. §§ 5104(e)(2)(D) and (G), which are Class B misdemeanors. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply to all the counts of conviction.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365

---

[4] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

(D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Mark Simon*, 21-cr-67 (ABJ), the court sentenced the defendant who pushed through the Rotunda to enter the Capitol Building  to 35 days in prison. In *United States v. Joshua Wagner*, 21-cr-310 (ABJ), the defendant entered through a broken window, called the

police traitors, encouraged other rioters to "hold the line" against the police, and, like Dropkin, ignored police officers' orders.  The court sentenced Wagner to 30 days' imprisonment.

In *United States v. Jeremy Sorvisto*, 21-cr-320 (ABJ), the defendant entered through the Senate Wing Doors, as did Dropkin, and remained inside the Capitol Building, including the Crypt area, for approximately 25 minutes. The court sentenced the defendant to 30 days' imprisonment. Although this defendant was in the Capitol Building for approximately half the time as Dropkin, Sorvisto had other aggravating factors, including lack of remorse and destruction of evidence, that warranted the 30-day sentence. *See also United States v. Paul Westover*, 21-cr-697 (JEB) (45 days' imprisonment for defendant who stormed past a group of police officers, made it to the Speaker's suite, celebrated the criminal conduct of others, and deleted photos and videos from his Facebook account and cell phone); *United States v. Clifford Meteer*, 21-cr-630 (CJN) (60 days' imprisonment for defendant who followed mob that overran police, remained in Capitol for 30 minutes, and made statements on Facebook and television showing lack of remorse).

Again, while Dropkin's conduct is not identical to any of the above-mentioned defendants, the combination of factors, including method and time of entry into the Capitol Building, the amount of time he spent in the Capitol Building, and the seriousness of his conduct while inside the Capitol Building, suggest that a sentence of 30 days' incarceration would be sufficient to avoid unwarranted sentencing disparities with other defendants who were similarly situated.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 30 days' incarceration on Counts One and Two, 36 months' probation on Counts Three and Four, 60 hours of community service and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      s/ *Christopher D. Amore*
CHRISTOPHER D. AMORE
Assistant United States Attorney
Capitol Breach Detailee
N.Y. Bar No. 5032883
970 Broad Street, Suite 700
Newark, NJ 07102
(973) 645-2757
Christopher.Amore@usdoj.gov

## CERTIFICATE OF SERVICE

On this 28th day of September, 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

_s/ Christopher D. Amore_
CHRISTOPHER D. AMORE
Assistant United States Attorney
Capitol Breach Detailee
N.Y. Bar No. 5032883
970 Broad Street, Suite 700
Newark, NJ 07102
(973) 645-2757
Christopher.Amore@usdoj.gov